Filed 9/15/15  P. v. Toscano CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>EMMANUEL TOSCANO et al.,<br><br>  Defendants and Appellants. | F065808<br><br>(Super. Ct. Nos. BF137702A-D)<br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is hereby ordered that the unpublished opinion filed herein on August 27, 2015, be modified as follows:

1. On page 39, the last sentence of the first full paragraph is deleted and the following sentence is inserted in its place:

    Both Gonzales and Aguero have joined in Garcia-Santos's argument.

Except for the modification set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.

_____
                                                                          HILL, P.J.

WE CONCUR:


_____
KANE, J.


_____
SMITH, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EMMANUEL TOSCANO et al.,<br><br>    Defendants and Appellants. | F065808<br><br>(Super. Ct. Nos. BF137702A-D)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Emmanuel Toscano.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Hilario Anthony Aguero.

A.M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant Fernando Garcia-Santos.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Gabriel Daniel Gonzales.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

In April 2011, appellant Emmanuel Toscano shot and killed Gerardo V., a 16-year-old high school student, in Bakersfield. Toscano and appellants Hilario Aguero, Fernando Garcia-Santos, and Gabriel Gonzales were tried together before a jury, and each was convicted of first degree premeditated murder, with robbery and gang special circumstance findings (Pen. Code,[1] §§ 187, 189, 190.2, subds. (a)(17), (22); count 1), second degree robbery (§ 211; count 2), shooting at an occupied motor vehicle (§ 246; count 3), and active participation in a criminal street gang (§ 186.22, subd. (a); count 4).[2] Toscano was further convicted of possession of a firearm by a felon (former § 12021, subd. (a)(1); count 5), and Aguero was convicted of assault with a semiautomatic firearm (§ 245, subd. (b); count 6) and a second count of active participation in a criminal street gang (§ 186.22, subd. (a); count 8) based on his involvement in a separate incident in August 2010.[3] Numerous sentence enhancement allegations were also found to be true and appellants each were sentenced, *inter alia*, to life in prison without the possibility of parole for the murder and received an additional enhancement of 25 years to life pursuant to section 12022.53, subdivisions (d) and (e)(1).

On appeal, appellants collectively and individually raise **16** issues. Regarding pretrial matters, Gonzales contends the trial court should have **(1)** granted his motion to

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

[2] Christian Albarran was also originally named as a defendant in the first four counts. However, Albarran entered a no contest plea prior to and did not otherwise participate directly in appellants' trial.

[3] Upon motion under section 1118.1, the court dismissed another charge against Aguero for attempted robbery (§§ 212.5, subd. (a), 664; count 7) based on the August 2010 incident.

sever the charges against Aguero only based on the separate August 2010 incident, and **(2)** sustained his objections to the admission of evidence of juvenile probation searches on the ground the prosecutor unlawfully disseminated records from his juvenile court case file without first petitioning for an order from the juvenile court.

Appellants contend the evidence was insufficient to support **(3)** their robbery convictions and the robbery special circumstance findings, **(4)** their convictions of first degree premeditated murder, and **(5)** the "primary activities" element of the statutory definition of "a criminal street gang."

Appellants raise additional challenges to the court's evidentiary rulings. They contend the court erred in **(6)** permitting the prosecution's gang expert to render an opinion regarding Toscano's coappellants' subjective knowledge of his weapon in violation of this court's decision in *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 (*Killebrew*), and Gonzales argues the court erred in **(7)** admitting evidence of certain text-message exchanges between codefendant Albarran and a fellow gang member and between Garcia-Santos and his girlfriend.

Appellants further contend the court erred in **(8)** failing to instruct, sua sponte, on the "escape rule" relevant to the felony-murder theory of liability, **(9)** instructing with an outdated version of CALCRIM No. 400, which advised the jury that an aider and abettor is "equally guilty" as the perpetrator of a crime, and **(10)** instructing the jury it could find appellants guilty of first degree premeditated murder under the natural and probable causes doctrine in violation of the Supreme Court's recent decision of *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). Garcia-Santos also contends **(11)** the prosecutor committed prejudicial misconduct in closing argument when discussing the concept of premeditation.

Concerning sentencing, Garcia-Santos and Gonzales contend that **(12)** the gang special circumstance does not apply to aiders and abettors, and **(13)** the section 12022.53, subdivision (e)(1) enhancement violates equal protection. Toscano contends that **(14)**

further correction is required regarding a redundant prior prison term finding the court made against him. Finally, appellants contend the abstract of judgment must be amended to **(15)** strike the unauthorized parole revocation fine, and (**16**) reflect the obligation to pay direct victim restitution is jointly and severally imposed upon all codefendants.

We disagree with all but the last two contentions and will therefore order the trial court to amend the abstract of judgment to strike the parole revocation fine and modify the victim restitution order. In all other respects, the judgment of conviction as to each appellant will be affirmed.

## FACTS

### Events of August 28, 2010 (counts 6-8)

Ramzee Johnson, an African-American man in his mid-thirties, lived with his family in a predominately Hispanic neighborhood in northeast Bakersfield. Around 3:00 a.m., on August 28, 2010, Johnson left his apartment to walk to an AM/PM market.

Shortly after leaving his apartment, Johnson saw appellant Aguero and Francisco Castro standing about a block and a half away. When Aguero and Castro started walking towards him, Johnson became nervous and began walking back to his apartment.

Aguero and Castro were walking faster than Johnson and soon overtook him. They then stood in front of him and started asking him "gang questions" like "where you from?" and "where you at?" Johnson replied he was "not from anywhere" and made statements to the effect he lived on the street where they were standing and that they were in front of his residence.

Castro suddenly pulled out a .25-caliber, semiautomatic firearm and Johnson heard a clicking sound, indicating the gun had been cocked. Believing he was about to be killed, Johnson grabbed for the gun. Although the gun fired as soon as he grabbed it, the shot missed him. Johnson then twisted the gun out of Castro's hand and fired it back at Castro. Aguero and Castro fell to the ground and then quickly got up and ran away.

4.

Johnson fired the gun in their direction several times until he heard a click and the gun appeared to be empty. Johnson then called 911 and the police soon arrived.

When the police arrived, some people in front of a nearby residence started yelling at the officers that their friends inside were shot and were bleeding. The police found Aguero and Castro inside the residence. They both had gunshot wounds and were lying on couches. Also present in the residence at this time were Jacob Gonzales, appellant Gonzales's brother, and Jacob Toscano, appellant Toscano's brother.

Aguero and Castro were transported to the hospital for treatment of their gunshot wounds. When a police officer returned to the hospital on August 30, 2010, to transport Aguero to jail for booking, the officer discovered that nursing staff had accidentally released Aguero from the hospital. Efforts to locate Aguero, prior to the April 30, 2011, incident underlying counts 1 through 5, were unsuccessful.

### Events of April 30, 2011 (counts 1-5)

The fatal shooting of Gerardo V. on April 30, 2011, occurred in a church parking lot in west Bakersfield. The parking lot was located next to a restaurant where Gerardo and some of his high school friends had gone that night to attend a quinceañera for a girl from their school.

In support of its theory that the shooting was an act of gang-related retaliation, the prosecution presented evidence that, six days earlier, on April 24, 2011, perpetrators, who shouted either "Westside" or "Southside," shot at Toscano and his brother, Jacob Toscano, resulting in injury to Jacob.

Christopher Wong, a deputy with the Kern County Sheriff's Department, testified he was dispatched to Bernard Street on April 24, 2011, in response to a "shots-fired call." When he arrived around 12:13 a.m., Wong found Jacob lying on the street with gunshot wounds to his right lower leg and upper left thigh. Toscano told Wong he had carried Jacob there from the intersection of Knotts and North King Streets, which was a little over a block away.

5.

Toscano told Wong that he and Jacob had been walking home from the 7-Eleven on North King, near Knott Street, when a car pulled up next to them and several African-American males exited the car and shot at them. When the assailants exited their car, they were shouting "Southside." Toscano told Wong he responded by "gangbanging back at them" and yelling "Hillside." Wong explained that "Hillside" refers to a sect of the Loma Bakers gang in the Hillside area of Bakersfield, which is located around North King and North Tulare.

Jessica Castellanos testified that, around midnight on April 24, 2011, she was visiting her boyfriend at his apartment on Knott Street, when she heard a car loudly approach, blaring music. Castellanos looked out the window and saw two males standing by her car on the street. The taller of the two looked like he might be African-American, and the shorter male was wearing a brown jacket.

The two males Castellanos saw were angrily yelling "gang things" back and forth to some other people outside her view. At least one of the two males yelled, "Westside." Castellanos could not remember specifically what the others were yelling, just that they were yelling something gang-related.

Castellanos then saw the male in the brown jacket kneel down and reach into his pocket. Castellanos heard two more gunshots and quickly moved away from the window. Castellanos heard five more gunshots a little later in the night.

Sheriff's Deputy Angelo Gonzalez was dispatched shortly after midnight to assist Wong. Gonzalez testified he spoke with Castellanos and she described seeing two African-American males standing in front of her car before she heard gunshots. Castellanos also said she heard one of them yell out "Westside" as they were looking towards the area of North King Street and Knotts Street. She then saw the shorter male reaching into a pocket for what she thought was a gun, after which she heard two gunshots. Approximately 10 to 15 minutes into his interview with Castellanos, Gonzalez heard some gunshots north of where they were.

6.

In the days after the April 24, 2011 shooting, Melina M., a 16-year-old who knew Toscano through her adult half-sister, Ashley, overheard Toscano and Ashley talking about Jacob being shot. Toscano appeared very angry and she heard him say "something about the Westside."

On the afternoon of April 30, 2011, Melina saw Toscano in Jefferson Park, and invited Toscano to attend her friend's quinceañera. Aguero was standing next to Toscano when Melina invited Toscano. At that time, Toscano did not appear interested and Melina did not expect him to come. Later that night, however, after Melina and Toscano exchanged a series of text messages, he and the other appellants, and a fifth "boy" Melina recognized but whose name she did not know, showed up outside the restaurant where the quinceañera was being held and Melina went out to meet them.

Melina became upset with Toscano when he started leading the others in his group in "pretending" to be members of the Westside Bakers gang. Melina knew Toscano was actually an "Eastsider" and member of the rival Loma Bakers gang. Melina testified (and other trial witnesses confirmed) Toscano and his friends were shouting "Westside" and directing Westside hand signals towards males connected with the quinceañera, who were socializing around the restaurant and the adjacent minimarket. Melina also heard Toscano and others in his group saying, "pretend, pretend." Toscano warned Melina in front of the others not to tell anyone they were from "the East." He also revealed to her that he was armed by lifting up his shirt and exposing the handle of a firearm tucked inside his pants.

Melina asked Toscano to leave and went back inside the restaurant where the quinceañera was still underway. From inside the restaurant, she watched appellants' group leave. They crossed in front of the restaurant and then started walking towards the church parking lot. The murder victim, Gerardo, and three of his friends, Francis R., Eduardo P. (Eddie), and Eduardo G. (Edward), were already in the church parking lot, standing outside Francis's Volkswagen Beetle, waiting for Francis to manually unlock

the car's doors so they could get in, when appellants' group suddenly approached and surrounded them. The parking lot was otherwise vacant of people, and Eddie recalled feeling intimidated by appellants' group.

Led by Toscano, appellants' group started asking Gerardo's group where they were from and Gerardo's group responded by saying "we don't bang." Maintaining the pretense that they were West Side Bakers, Toscano and the others is his group started making derogatory comments about Eastsiders (i.e., members of appellants' gang) and asking Gerardo's group where they could find some Eastsiders. Gerardo's group continued to respond by repeating they did not bang.

Eventually, appellants' group shook hands with Gerardo's group and appeared to be preparing to leave. In the meantime, Gerardo's group got inside Francis's car, with Francis sitting in the driver's seat, Gerardo in the front passenger's seat, Edward in the backseat behind Francis, and Eddie in the backseat behind Gerardo. After they were all in the car, Eddie noticed the passenger-side door where Gerardo was seated was still open. Eddie then heard Toscano say "Keep it Westside," to which he heard Gerardo reply, "I'm Westside, too."

According to Eddie's testimony, after Gerardo said he was Westside too, Gonzales came up to the car and asked Gerardo what he had just said. When Gerardo repeated he was from the Westside too, Gonzales replied, "You're not from my hood", and challenged Gerardo to get out of the car and fight him.

Gonzales was soon joined by Toscano and the others in appellants' group in verbally challenging Gerardo to get out of the car and fight. They were also saying things to "pump up" Gonzales, including: "Just fight him. Just fight him." Gerardo's friends told Geraldo to be quiet and Francis started up his car; however, Francis could not drive anywhere without hitting someone because appellants' group had surrounded the car.

8.

While their recollections of events differed in some details, Eddie, Edward, and Francis consistently testified to seeing Gonzales reach into the car and grab Gerardo's cell phone from out of his hands or off his lap. As Gonzales grabbed the cell phone, Eddie heard him call Gerardo a "bitch" and say "give me your fucking phone."

According to Eddie's testimony, after Gonzales took Gerardo phone, Gerardo started "begging" him to return it. Gonzales responded by saying something to the effect that he would return Gerardo's phone, but first Gerardo would have to get out of the car and fight him. Meanwhile, appellants' group continued to challenge Gerardo to get out of the car and fight with Gonzales.

Remaining inside the car, Gerardo continued imploring Gonzales to return his cell phone and repeating that he did not want to fight Gonzales. Gerardo also expressed some confusion, asking Gonzales why they were supposed to be fighting when they were supposed to be from the "same hood."

Eventually, Gonzales reached into the car again and grabbed Gerardo's hat from off his head. Eddie heard Gerardo tell Gonzales to keep the hat but to give him back his phone. Gerardo continued to complain about his phone and his friends urged him to be quiet and to close his car door. Before Gerardo finally closed his door, Eddie heard him say, "I'm going to call the big [homeys]."

After Gerardo said he was going to call the big homeys and closed his door, Toscano walked back up to the car and opened Gerardo's door. Toscano then pulled out a gun and shot Gerardo. Eddie explained that Toscano did not have to walk far to open the car door because, right before Gerardo closed it, Toscano and the rest of appellants' group were still surrounding Francis's car. When Toscano opened the car door to shoot Gerardo, Eddie saw Gonzales standing "right next to [Toscano]" and the other appellants "a few feet away from him."

After the shooting, appellants ran together towards a nearby alley, shouting something as they ran. Meanwhile, Gerardo got up out of Francis's car and started

9.

running towards the restaurant. Gerardo collapsed outside the restaurant and died shortly thereafter from a gunshot wound to his left shoulder. The pathologist who performed the autopsy explained that Gerardo suffered extensive blood loss due to the laceration of vital organs, including a major vein in his heart and the upper lobes of both his lungs.

### *Gang expert testimony*

Kern County Sheriff's Deputy Richard Hudson testified as a gang expert for the prosecution. Hudson opined that, at the time of their offenses, appellants, codefendant Albarran, Jacob Toscano, and Francisco Castro (Aguero's accomplice in the August 2010 offenses) were all members of, and active participants in, the Loma Bakers criminal street gang.

Presented with hypotheticals based on the evidence of the August 2010 and April 2011 incidents underlying the charged offenses, Hudson opined the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang. With respect to the gang-benefit of the April 2011 offenses, Hudson opined that that the scenario presented was an act of retaliation and explained:

> "When an individual is put in a situation where a gang is going to require retaliation, when they conduct that retaliation they're going to create status, fear within the neighborhood, because this incident will be talked about. It will be discussed. People will hear about it in schools. They'll hear about it in the neighborhood. It will get around.
>
> "So the information will get out to other gangs, as well as the neighborhood, that these individuals, when disrespected, will, in this case, kill you, and by doing that they're going to limit the amount that people will be willing to testify; that other gang members will be willing to come to their neighborhood and disrespect them."

Regarding his opinion that the offense were committed in association with a criminal street gang, Hudson specifically testified:

> "Based on the hypothetical, all the members acted together to accomplish a goal. They traveled together to rival territory. They all pretended to be Westside together. They all took part in that. They attempted to identify—

10.

through the hypothetical attempted to identify rivals. Once they did they all acted together by moving as a group from one point to another to confront those individuals that they perceived to be rivals. They also confronted them by both words, surrounding, and then this violence escalated together as they continued to support each other. And then when the cell phone and hat was taken, while the others were present, they continued to be verbally and physically supportive and backing that individual, continuing to say different statements. And then the mere numbers of surrounding is an intimidation. And then during the shooting all the other individuals were still present by the shooter and they all fled together."

***The defense***

Harlan Hunter, a private investigator and former public defender investigator, testified as a gang expert on behalf of Gonzales. Hunter opined that on April 30, 2011, Gonzales was not a member of, or an active participant in, the Loma Baker criminal street gang.

Assuming the same hypothetical facts based on the April 2011 incident, as those addressed by the prosecution's gang expert, Hunter opined that the shooting was a "personal incident" and was "not done for the benefit of a gang, but … was actually done for the benefit of the shooter, who basically had come there already upset about a previous shooting of his brother, and at that particular time decided that he was going to shoot the victim."

Harlan further opined:

"[T]here's nothing in that hypothetical that supports any notion, idea, [or] knowledge that the other parties who were with the shooter had knowledge that the shooter was going to shoot the victim. [¶] And so again, it's my opinion on that particular day that this was not done for the benefit and in association with these other individuals, but done by an individual who basically was angered by this threat of don't make me get my big homeys, which is akin to don't make me go get my friends and come back and deal with you, became upset and shot the victim."

11.

## DISCUSSION

### I.    *Denial of Motion to Sever*

Gonzales contends the trial court erred in denying his pretrial motion to sever the trial of counts 6 through 8, relating to the August 2010 incident involving appellant Aguero only, from the trial of counts 1 through 5, relating to the April 2011 incident involving all four appellants.  Garcia-Santos joins in Gonzales's arguments.

Gonzales concedes the offenses in this case were of the same class, and, therefore, their joinder was permissible under the applicable statute.  (§ 954 [two or more offenses of same class may be joined in accusatory pleading]; *People v. Ochoa* (2001) 26 Cal.4th 398, 423; *People v. Bradford* (1997) 15 Cal.4th 1229, 1315; *People v. Arias* (1996) 13 Cal.4th 92, 126 (*Arias*) ["[w]hen exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial"].)  Because the statutory requirements for joinder were met, we may reverse only if a clear showing of resulting prejudice has been made.  (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 447 (*Williams*).)

In *Williams, supra*, 36 Cal.3d 441, our Supreme Court stated several factors to be considered in deciding whether charges should be severed:  (1) the lack of cross-admissibility of evidence; (2) the prejudicial effect of joining one charge with a more inflammatory charge; (3) the prejudicial effect of joining a weak case with a strong case; and (4) whether the People sought to join a charge with a capital offense.  (*Id.* at p. 452.)  Gonzales's challenge focuses on the first two factors.

With respect to the first factor, the trial court in this case observed that the joined charges shared common elements "at least with respect to the gang allegations." Consequently, the court found cross-admissibility of evidence "as to the testimony of the gang expert, who … outline[d] the defendants' gang contacts with law enforcement in order to give opinions in this case."

Relying heavily on *Williams*, *supra*, 36 Cal.3d 441, where joinder was found to be improper, Gonzales suggests the trial court erred in finding the gang evidence cross-admissible. In *Williams*, the court concluded that just because the two murders were gang related did not render the gang evidence cross-admissible under Evidence Code section 1101. (*Williams*, at p. 450.)

However, *Williams*, *supra,* 36 Cal.3d 441, was a capital case, where "it is the joinder *itself* which gives rise to the special circumstances allegation of multiple murder." (*Id.* at p. 454.) Therefore, "the court [had to] analyze the severance issue with a higher degree of scrutiny and care than is normally applied in a noncapital case." (*Ibid.*) *Williams* also predated section 186.22, so its treatment of gang evidence is inapposite. Unlike in *Williams*, the relevant gang evidence here was clearly cross-admissible to prove the gang-related charges and special allegations in both cases (§§ 186.22, subds. (a), (b)(1), 190.2, subd. (a)(22), 12022.53, subd. (e)(1)).

In any event, the issue of whether the evidence relevant to the joined charges was cross-admissible is not determinative. (§ 954.1 [evidence need not be cross-admissible before jointly charged offenses may be tried together]; *Arias*, supra, 13 Cal.4th at pp. 126-127; *People v. Marquez* (1992) 1 Cal.4th 553, 572-573 [the absence of cross-admissibility is not enough to demonstrate prejudice].) The required clear prejudice has not been shown in this case. (*People v. Marquez, supra,* at p. 572 [the burden is on defendant to show prejudice].)

Gonzales's reliance on *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933 is misplaced because the facts of that case are completely different than the facts here. There, an attempted murder charge against Calderon and a codefendant was joined with an "execution-style" murder charge against the codefendant and another man. The appellate court found that the trial court abused its discretion in consolidating the cases because, with one exception, none of the evidence related to the "execution-style" murder was admissible against Calderon, the "execution-style" murder was likely to inflame the

13.

jury, and the evidence against Calderon was weak but the evidence against his codefendant was strong. (*Id.* at pp. 939–941.)

Notwithstanding Gonzales's assertions to the contrary, there was nothing particularly inflammatory about the joined charges. It certainly cannot be said that the evidence of Aguero's August 2010 crimes—which ended with the uninjured, adult victim successfully grabbing his assailants' weapon and firing it on them as they fled—was likely to inflame the jury unduly with regard to Gonzales's and the other appellants' April 2011 crimes, which ended with the fatal shooting of an unarmed, 16-year-old high school student as he was sitting in his friend's car in a church parking lot.

## II. *Dissemination of Records from Gonzales's Juvenile Court Case File*

During in limine proceedings, Gonzales objected to the admission of evidence concerning juvenile probation searches conducted on him and his brother in 2008 and 2010, which uncovered evidence of their mutual gang membership. Gonzales objected on the ground the details of the probation searches came from juvenile probation reports, which were part of his confidential juvenile court case file and which were unlawfully disseminated by the prosecutor to Deputy Hudson, the prosecution's gang expert, and appellants' trial attorneys without first petitioning for a juvenile court order as required by Welfare and Institutions Code section 827 (hereafter, section 827).

Section 827, subdivision (a)(1) provides, in relevant part:

"[A juvenile] case file may be inspected only by the following: [¶] … [¶] (B) The district attorney .… [¶] … [¶] (E) The attorneys for the parties, judges, … and law enforcement officers who are actively participating in criminal or juvenile proceedings involving the minor. [¶] … [¶] (P) Any other person who may be designated by court order of the judge of the juvenile court upon filing a petition."

In overruling Gonzales's objections, the trial court found, *inter alia*, that no violation of section 827 occurred because the prosecutor undisputedly obtained copies of the probation reports directly from the sheriff's department, not from Gonzales's juvenile

14.

court case file. On appeal, Gonzales argues this was error because a juvenile probation report falls "within the [statutory] definition of 'a juvenile case file.'"[4] Therefore, Gonzales contends, even though the prosecutor was entitled to inspect his juvenile case file on her own without a juvenile court order under subdivision (a)(1)(B) of section 387, subdivision (a)(1)(P) of the statute required her to petition the juvenile court for an order before disseminating copies of the contents of his case file to Hudson and other attorneys in the case.

Assuming *arguendo* the trial court erred in finding the juvenile probation reports were not subject to section 827, we agree with the People that the trial court correctly concluded no violation of the statute occurred because, contrary to Gonzales's assertions, none of the persons with whom the prosecutor shared copies of his probation reports was required to petition the juvenile court for an order before inspecting his juvenile court case file. Gonzales interprets the reference to *the minor* in section 827, subdivision (a)(1)(E), to mean the gang expert and trial attorneys involved in the instant proceedings would be entitled to inspect his juvenile court case file without a court order but only if he were still *a minor*. Because he was not a minor, Gonzales asserts section 827 subdivision (a)(1)(P) was applicable and they were required to petition the juvenile court for an order to inspect his juvenile court case file and the prosecutor could not lawfully circumvent this requirement by providing them with copies of his juvenile probation reports she obtained from the sheriff's department.

Gonzales's interpretation of section 827, subdivision (a)(1)(E), as creating different requirements depending on the current age of the person whose juvenile case

---

**4** Gonzales relies on section 827, subdivision (e), which provides: "For purposes of this section, *a 'juvenile case file' means* a petition filed in any juvenile court proceeding, *reports of the probation officer*, and all other documents filed in that case or made available to the probation officer in making his or her report, or to the judge, referee, or other hearing officer, and thereafter retained by the probation officer, judge, referee, or other hearing officer." (Italics added.)

file is at issue, is unpersuasive and unsupported by the plain language of the statute. Upon reaching adulthood, Gonzales did not cease being the person designated as *the minor* in his juvenile court case records. Because appellants' trial counsel and the prosecution's gang expert were "actively participating in *criminal … proceedings* involving the minor [i.e., Gonzales]" they were statutorily entitled to inspect his juvenile court case file without first obtaining a juvenile court order. It cannot be said, therefore, that the prosecutor violated section 827 by providing them with copies of records they were already permitted to inspect on their own without a court order.

## III. *Sufficient Evidence of Robbery and Robbery Special Circumstance Findings*

In challenging the sufficiency of the evidence to support their convictions of robbery and the robbery special circumstances findings, all four appellants challenge the sufficiency of the evidence to establish that Gonzales committed the crime of robbery. Toscano also contends there is insufficient evidence he aided and abetted Gonzales's commission of robbery, and that the evidence was insufficient to prove he was guilty of robbery based on a natural and probable consequences theory. Finally, all four appellants challenge the robbery special circumstance findings on the ground the robbery was merely incidental to the murder and there was insufficient evidence of an independent felonious purpose for the crime.

### A. *Standard of review*

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) We accept the logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise. (*Ibid.*) Our review is the same in a prosecution primarily resting upon circumstantial evidence. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) We do not reweigh the evidence or

reassess the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*)

### B.      *"Fear or force" and "intent to permanently deprive"*

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Thus, the elements of robbery are: (1) the taking of personal property (2) from a person or the person's immediate presence (3) by means of force or fear, (4) with the intent to permanently deprive the person of the property. (*Ibid.*; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) Appellants contend the evidence was insufficient to establish the third and fourth elements of robbery.

With respect to the third element, appellants assert that Gonzales's simple act of reaching inside the car and grabbing or snatching Gerardo's cell phone and hat was insufficient to prove Gonzales accomplished the taking of Gerardo's property by means of force or fear. However, "the requisite force or fear need not occur at the time of the initial taking. The use of force or fear to escape or *otherwise retain even temporary possession of the property* constitutes robbery." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 771–772, italics added.)

Even assuming the requisite force or fear did not occur at the time of the initial taking, the record discloses substantial evidence that Gonzales used force or fear to *retain* possession of Gerardo's property and therefore the evidence was sufficient to satisfy the third element of robbery. It is evident from the record that Gerardo dearly wished to recover possession of his cell phone and the jury here could have reasonably inferred from all the circumstances that he would have attempted to reclaim his phone but fear prevented him from doing so. Gerardo's fear was evident in his obvious reluctance to leave the shelter of Francis's car to try to reclaim his phone, and the evidence supports a

17.

reasonable inference that Gonzales and the other appellants intentionally engaged in intimidating behavior to instill fear in Gerardo to help Gonzales retain possession of, and eventually carry away after the shooting, the items he initially snatched away from Gerardo. Such behavior included standing together in close proximity to the car and encouraging and participating in Gonzales's continuing challenges to the victim to get out of the car and fight.

We likewise conclude there was sufficient circumstantial evidence from which the jury could reasonably infer that Gonzales intended to permanently deprive Gerardo of his property and thus satisfy the fourth element of robbery. It is well established that the intent with which a person acts is rarely susceptive of direct proof and usually is inferred from the factual circumstances of the offense. (Former § 21, subd. (a), § 29.2; *People v. Massie* (2006) 142 Cal.App.4th 365, 371.) Although Gonzales reportedly said he would return Gerardo's cell phone *if* Gerardo first got out of the car to fight him, the jury was not required to credit, and could have reasonably doubted the sincerity of, Gonzales's statements, especially in light of evidence appellants had already engaged in deception that night (i.e., pretending to be members of a rival gang) to target the victim, and conclude that Gonzales intended to deprive the victim permanently of his property whether or not he succeeded in luring the victim out of the car.

### C.    *Aiding and abetting*

Assuming Gonzales committed robbery, Toscano contends the evidence was insufficient to show he aided and abetted the commission of the crime. Garcia-Santos and Gonzales both join in Toscano's arguments.[5]

---

**5**    In a footnote, the People assert that Garcia-Santos's and Gonzales's cursory joinders of Toscano's arguments are insufficient to establish their individual prejudice. The People contend Garcia-Santos and Gonzales cannot therefore satisfy their burden on appeal, citing *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 (*Nero*). We need not analyze whether Garcia-Santos's and Gonzales's joinders were sufficient to establish their own individual prejudice because, when we presume that Garcia-Santos and Gonzales suffered the same prejudice as argued by Toscano, their claims have no merit.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164 (*Cooper*).)

Neither presence at the scene of a crime nor failure to prevent its commission is sufficient alone to establish aiding and abetting. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) "In addition, flight is one of the factors which is relevant in determining consciousness of guilt." (*Id.* at p. 1095.)

Whether or not Gonzales's coappellants knew or shared his intent to rob Gerardo before he committed the robbery, for purposes of determining aiding and abetting, "the intent to facilitate or encourage [the] commission of the robbery [must be formed either] prior to *or during* the carrying away of the loot to a place of temporary safety." (*Cooper*, *supra*, 53 Cal.3d at pp. 1164–1165, some italics omitted, fn. omitted.) Therefore, even assuming the others appellants were ignorant of Gonzales's intent immediately before the robbery, there was sufficient evidence they formed the requisite intent to facilitate or encourage the robbery *during* his commission of the crime. Such intent is evident in appellants' conduct during the robbery, which, notwithstanding Toscano's contrary assertions, actively aided Gonzales's commission of the crime.

Gonzales's coappellants were not merely present during, nor did they simply fail to prevent Gonzales from committing, the robbery. As previously discussed, they remained with Gonzales in close proximity to the car where Gerardo was sitting and continued to "pump up" Gonzales with words of encouragement and to participate in Gonzales's challenges to Gerardo to fight, conduct which undoubtedly contributed to

19.

Gerardo's refusal to leave his friend's car to try to reclaim his property. In other words, there was substantial evidence Aguero, Garcia-Santos, and Toscano actively assisted Gonzales's commission of the robbery by lending him both their verbal support and the support of their intimidating physical presence.[6]

### D.    *Sufficient evidence of an independent felonious purpose*

Finally, appellants contend the evidence was insufficient to sustain the robbery special circumstance findings because the evidence established the robbery was merely incidental to the murder and there was insufficient evidence the robbery had an independent felonious purpose.

Under section 190.2, subdivision (a)(17)(A), the robbery special circumstance applies when:  "The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:  [¶] (A) Robbery in violation of Section 211 or 211.5."

"For a felony-murder special circumstance to apply, the felony cannot be merely 'incidental or ancillary to the murder'; it must demonstrate 'an independent felonious purpose,' not an intent 'simply to kill.'  [Citations.]  But even if a defendant harbored the intent to kill at the outset, a concurrent intent to commit an eligible felony will support the special circumstance allegation."  (*People v. Davis* (2009) 46 Cal.4th 539, 609.)

We agree with the People that there was substantial evidence in this case to support a finding that appellants harbored both an intent to kill and a concurrent intent to rob, which were sufficient to support the robbery special circumstance findings and we

---

[6]    Because there is sufficient evidence to support Garcia-Santos's, Gonzales's, and Toscano's convictions of robbery on a direct aiding and abetting theory of liability, we need not reach Toscano's contention that the evidence was also insufficient to support his conviction on the alternative natural and probable consequences theory of liability, on which the jury was instructed in connection with the robbery and murder counts, and which we discuss in greater detail below in part XI of our discussion.

reject their argument that the robbery was merely incidental to the murder. As the facts of the murder demonstrate, it was not even necessary for appellants to lure Gerardo outside the car in order to kill him. Moreover, Gerardo's unwillingness to leave the car became apparent early on in his confrontation with appellants' group.

On this record, therefore, it would not have been unreasonable for the jury to conclude that, after the initial taking of Gerardo's possessions by Gonzales but before his fatal shooting by Toscano, appellants likely realized they were not going to be able to use Gerardo's possessions to lure the 16-year-old victim out of his friend's car and so formed an independent intent to deprive him permanently of those possessions while concurrently harboring their original intent to kill. As already discussed, there was sufficient evidence that appellants accomplished this independent intent to rob through the use of fear and intimidation. We therefore reject the argument that the evidence established that appellants' intent during the robbery was simply to kill and that there was no independent felonious purpose for the robbery.

## IV.    *Sufficient Evidence of Premeditated First Degree Murder*

Aguero and Gonzales both contend there was insufficient evidence to support their convictions of premeditated first degree murder. Garcia-Santos joins in their arguments without providing further legal authority or contentions. Although Aguero and Gonzales challenge the sufficiency of the evidence to support their murder convictions on the various theories presented to the jury, we need only address the sufficiency of the evidence to support their convictions under one of those theories. As discussed, *post*, in part X of the opinion, the jury's findings on the gang special circumstance (§ 190.22, subd. (a)(2)) make clear the jury found appellants Aguero, Garcia-Santos, and Gonzales guilty of first degree premeditated murder under a theory of direct aiding and abetting. Substantial evidence supports appellants' convictions under this theory.

"Aiders and abettors may … be convicted of first degree premeditated murder based on direct aiding and abetting principles. [Citation.] Under those principles, the

21.

prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra*, 59 Cal.4th at pp. 166–167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id.* at p. 167.)

Notwithstanding Aguero's and Gonzales's contrary arguments, which are based on selective readings of the record, we conclude the evidence was more than sufficient to show that they and Garcia-Santos knowingly and intentionally assisted Toscano's commission of premeditated murder. The circumstances surrounding the shooting, combined with the gang expert's testimony, gave rise to a reasonable inference that appellants, acting as a group, purposefully set out together to the location of the quinceañera, and pretended to be members of the rival Westside Bakers gang, with the intent of finding and killing a member of the rival gang in retaliation for the shooting of Toscano's brother just six days earlier. As reflected by the gang expert's testimony regarding the hypothetical based on the underlying incident, there was evidence showing appellants acted as a group throughout the incident, including by coming back to surround or at least remaining in close proximity to the car when Toscano went back to shoot Aguero. The gang expert's testimony and Melina's testimony also supported a reasonable inference that the other appellants knew Toscano was armed, and knew what he was deliberating and intending to do when he returned to the car, opened the door, and shot Gerardo, and that they intended to back him up in his commission of the murder.

## V. *Sufficient Evidence of the Gang's "Primary Activities"*

Aguero and Gonzales challenge the sufficiency of the evidence to support the gang-related special allegations and substantive gang offense on the ground the prosecution presented insufficient evidence to prove the "primary activities" (§ 186.22,

22.

subd. (f)) element of the statutory definition of a criminal street gang because, throughout his testimony, the prosecution's gang expert, Deputy Hudson, primarily used the phrase *primary criminal activities* rather than *primary activities* in describing the activities of the Loma Bakers gang. Garcia-Santos and Toscano both join in this argument.

To establish that a group is a "criminal street gang" within the meaning of the relevant statute, the prosecution must prove, among other elements, that one of the group's primary activities is the commission of one or more offenses listed in section 186.22, subdivision (e), and that the group's members engage in, or have engaged in, a pattern of criminal gang activity. (§ 186.22, subd. (f); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)

The term "'primary activities' … implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) Sufficient proof of these "primary activities [may] consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute," or testimony from a police gang expert, who bases his or her opinion on conversations with gang members, personal investigations of crimes committed by gang members, and information from law enforcement colleagues. (*Id*. at p. 324, italics omitted.) We may consider both past and currently charged offenses as part of the gang's "'primary activities.'" (*Id* at p. 323.)

Aguero and Gonzales do not dispute that the jury instructions given in this case correctly defined a "criminal street gang" pursuant to CALCRIM No. 736, in relevant part, as a group having "as one or more of its primary activities, the commission of Murder, Assault with a Deadly Weapon, Narcotics Trafficking, and Possession of Firearm by a Felon …." Nor do they dispute that there was sufficient evidence to show

23.

they were active members of a group known as the Loma Bakers or otherwise challenge any of the other elements of the relevant gang statute.

Instead, as mentioned above, Aguero and Gonzales contend the prosecution presented insufficient evidence the Loma Bakers gang had, as one or more of its primary activities, the commission of the qualifying offenses listed in the jury instruction based on Hudson's use of the phrase *primary criminal activities* in his testimony instead of *primary activities*. Aguero thus asserts "[t]he jury could not infer that the primary criminal activities were also the primary activities without committing the logical fallacy of composition, assuming that what was true for the part (criminal activities) was also true for the whole (all activities)."

This argument fails because the jury was not required to commit any logical fallacies in order to find that the commission of crimes Hudson described (and listed in his accompanying PowerPoint presentation) as constituting the Loma Bakers' "primary criminal activities" also constituted the gang's "primary activities" because the prosecutor pointedly elicited testimony from the gang expert confirming this to be the case and adding, "[the Loma Bakers] have been consistent that way since I've been in law enforcement here."

Moreover, we see little support in the record for Aguero's assertion that the "noncriminal activities" of the Loma Bakers might "predominate, so that commission of a particular crime would not be a primary activity even though, when only the organization's criminal activities are taken into account, it is a primary activity within that subset." Hudson's testimony describing how the Loma Bakers benefited from the commission of crimes he listed as their "primary criminal activities" actually helped to illustrate the fundamentally *criminal* purpose of the group and to show how the crimes it committed were not only primary activities of the group but necessary to its existence. For example, Hudson testified that one of the gang's primary criminal activities was the sale of controlled substances, explaining that, because most gang members did not hold

24.

regular nine-to-five jobs, they often lived at home with parents or relatives, and relied on illegal drug sales to raise money to purchase "whatever they may need to commit their next crime."

Aguero's argument on appeal, ironically, relies heavily on Hudson's testimony that Loma Baker gang members commonly congregated and spent their days hanging out at Jefferson Park as evidence the gang functioned as a social association "quite apart from any criminal purpose." This reliance ignores or overlooks earlier testimony by the gang expert indicating it was largely the gang members' involvement in criminal activity which influenced their selection of Jefferson Park as a meeting place in the first place, specifically because of the opportunities the park provided to evade apprehension by law enforcement officers. Hudson thus explained that "there's large areas that are hilly, so it's very difficult to catch people in that park" and "very easy to get away and evade law enforcement."

Aguero further claims that Hudson's opinion regarding the Loma Bakers' primary activities lacked adequate foundation because the expert's testimony revealed it was based on an incorrect legal conclusion entitled to no weight. Thus, he asserts that "the expert made it clear that in his opinion a crime qualified as a primary criminal activity of the gang even if, to his knowledge, there was only a single instance of commission of that crime" and "[o]f course this is flatly contrary to the Supreme Court's admonition that a primary activity must be one of the 'chief' or 'principal' activities of the gang, not an 'occasional,' activity, must less a one-time episode."

Assuming Aguero did not forfeit his foundational challenge by failing to raise it below, we reject it on the merits. As a general matter, we note that Aguero's arguments challenging the foundation of Hudson's opinions are based on isolated statements taken out of context from his cross-examination testimony. When read in context with the expert's testimony as a whole, we conclude these statements do not support his arguments.

25.

Contrary to Aguero's assertions, Hudson's cross-examination testimony did not demonstrate Hudson erroneously believed a single commission of murder by a Loma Baker gang member would suffice to establish the commission of murder was a primary activity of the gang.[7] In his testimony and PowerPoint "slide" addressing the Loma Bakers primary activities, Hudson referred to the commission of crimes in the *plural*; i.e. "murders, robberies, assault with deadly weapons, sales of controlled substances," and "illegal weapons possessions." The expert's testimony further established that the opinions he rendered in this case were based not only on the "hundreds" of gang-related investigations he had personally been involved in, but also on his extensive training and conversations with other officers and actual gang members. Therefore, a reasonable interpretation of the cross-examination testimony cited by Aguero is not that the expert believed his knowledge of a single murder committed by a Loma Baker gang member would be sufficient by itself to satisfy the primary activities element of the gang statute, but rather that, even if he was personally aware of only one such murder, he would still consider murder to be a primary activity of the gang based, not on his personal knowledge of one murder, but on his training and all the other sources of information he properly reviewed and relied on in rendering his expert opinions in this case.

We have likewise reviewed and reject similar arguments Aguero raises challenging the adequacy of the gang expert's opinion based on isolated statements taken out of context from his lengthy trial testimony. We conclude the evidence in this case

---

[7] Aguero specifically relies on this exchange during Hudson's cross examination by Garcia-Santos's trial attorney: "Q. Do you use the number of the types of crimes in determining whether or not it's a primary criminal activity? [¶] A. The number— [¶] Q. The number of that certain crime committed. [¶] A. Okay. I don't specifically. I just use crimes that I'm aware of myself. [¶] Q. Okay. So let's say, for example, you're aware of one crime, a certain crime. Let's say, for example, you're aware of one murder committed by the Loma Bakers. [¶] A. Okay. [¶] Q. With one murder committed by the Loma Bakers, would that be—would you consider that to be a primary criminal activity? [¶] A. With one murder? [¶] Q. Yes. [¶] A. I could still consider it being a primary criminal activity. I'm aware of it."

26.

was more than sufficient to sustain the primary activities element of the statutory definition of a criminal street gang and we do not find any of Aguero's or Garcia-Santos's contrary arguments to be persuasive.

## VI.   *Gang Expert Testimony and Killebrew*

Garcia-Santos and Gonzales contend that the trial court erred in permitting the prosecution's gang expert to render, over defense objections, an improper opinion about their subjective knowledge of Toscano's weapon in violation of principles set forth in this court's opinion in *Killebrew*, *supra*, 103 Cal.App.4th at page 657.  Hudson testified in relevant part as follows:

> "[THE PROSECUTOR:] Q. Do you have any training about whether or not when one person has a firearm, whether the other gang members know about it?
>
> "[HUDSON:] A. Yes, ma'am.
>
> "Q. What's that training?
>
> "A. Training would include the conferences I spoke about earlier when we go to gang conferences, information passed along during meetings.  I've also had training directly related to when I've spoken to actual gang members about whether or not they would be aware of other members possessing guns, what would they expect, what would they do in that situation.
>
> "Q. About how many gang members do you think you've talked to about that?
>
> "A. Dozens.  I couldn't give you an exact number, ma'am, but I've talked to—that's one of the primary questions I ask gang members when I speak with them if I can get to that point with talking to them.
>
> "Q. So that's a pretty important concept.
>
> "A. To me it is, yes.
>
> "Q. So you've been trained about that concept and you've talked to gang members about that concept?

27.

"A. Yes, ma'am.

"Q. And have you previously testified about that concept?

"A. Yes, ma'am. [¶] … [¶]

"Q. I'd like you to assume the following: That we have one gang member going with other gang members to commit a crime, so they're traveling together.

"A. Okay.

"Q. And one gang member is armed. Do rules govern as to whether that gang member who is armed has to tell the others that he is armed?

"A. Yes.

"Q. Tell us about those rules that govern that type of concept.

"A. From my contacts with gang members, they would expect to be told about the firearm to know where it is in case of a defensive or offensive is needed, they would be able to acquire that gun if the person that had it was unable to use it.

"Not only further, they would also expect them to tell them because if they get stopped, they need to know about that gun. Someone in the car might be on parole, might get charged with it. They're going to discuss that.

"And further, they're going to expect each other to know about it.

"Q. All right. So if one person is armed, generally the other gang members are going to know about it. [¶] … [¶]

"A. Hypothetically. Generally, yes. [¶] … [¶]

"Q. Would it be considered, sir, hypothetically, of course, disrespectful if the person who is carrying a gun didn't tell the others about it?

"A. If they were going somewhere together in that situation as I described, yes, it would be considered disrespectful.

"Q. Why would it be disrespectful?

28.

"A. Because you could put the other people in the car in a situation without their knowledge of it.

"Q. And this applies to something—does it apply to more than cars?

"A. Sure.  It could apply to if they were all going to a specific location together or meeting somewhere, commonly if someone goes somewhere, especially when you're dealing with a gang, usually the—my experience has been that the individuals, even without having to tell them, will know that they have a gun because they've told them in the past because they usually will brag about it.  So everyone's going to know they have a gun in that clique anyways, but they're generally going to tell the people that are in the gang that don't know hey, I've got a gun on me, we're going here.  If something happens, this is where it's at.

"Q.    Is this true in Sureno street gangs?

"A.    Yes, ma'am.

"Q.    And specifically the Loma?

"A.    Yes, ma'am."

The trial court properly admitted this testimony.  "The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.)  "Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citations.] [¶]  The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.'" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; see also *People v. Olguin*, *supra*, at pp. 1369–1370.)

Garcia-Santos and Gonzales contend that, although masked as a hypothetical, Hudson's testimony essentially opined that they each had specific knowledge of Toscano's weapon, as ruled improper in *Killebrew*, *supra*, 103 Cal.App.4th at pages 657–

29.

658.  However, in *Killebrew*, this court drew the crucial distinction between permissible expert testimony as to "the *expectations* of gang members in general when confronted with a specific action" (*id.* at p. 658) and impermissible testimony as to what a defendant was actually thinking during commission of a crime—the expert "testified to the subjective knowledge and intent of each occupant in each vehicle." (*Id.* at p. 658, italics omitted.)  The record does not support appellants' position because, in the challenged instances, Hudson was testifying as to the expectations of a typical gang member in various situations as permitted under *Killebrew*.  As this court explained:  "Testimony that ... gangs would travel in large groups if expecting trouble, that in a confrontation more than one gang member may share a gun in some identified circumstances, and that oftentimes gang members traveling together may know if one of their group is armed, would have been admissible." (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658.)  The same is true of Hudson's testimony in this case.

## VII.    *Admission of Albarran's and Garcia-Santos's Text Messages.*

Gonzales contends that the trial court erred in admitting evidence of certain text message exchanges between codefendant Albarran and another Loma Baker gang member known as "Sicko" as statements of a coconspirator under Evidence Code section 1232, and between appellant Garcia-Santos and his girlfriend "Viri" as declarations against penal interest under Evidence Code section 1230.

### A.    *Additional background*

#### 1.    *Albarran text messages*

Regarding Albarran's text message exchanges with Sicko, Gonzales complains the trial court erred in overruling his objections to the following two exchanges and finding them admissible as statements of a coconspirator.

The first exchange occurred on April 24, 2011, around 5:00 p.m.:

Albarran:  "u herd what happen 2 lil j [Jacob Toscano]?"

30.

Sicko: "Yea I did I wana get them foos who did it dawg. u down or what?"

Albarran: "Hell yea I'm down.  I don't know who.  lil e [Toscano] told me they were weeksiders."

Sicko: "I heard that same thing."  (Some punctuation added.)

The second exchange occurred the same day around 6:00 p.m.:

Sicko: "Where did j get shot at?"

Albarran: "Like w[h]ere it the st[reet] or w[h]ere on his body?"

Sicko: "The spot where at.?

Albarran: "by jumbugs pad on [K]notts."

Sicko: "Is that right im pretty sure it had something to do with those niggers."

Albarran: "I don't think they live there kus I haven't been seeing them."

Sicko: "what did lil e say r we gona get them foos or what?"

Albarran: "Kosher sead yea."

Sicko: "Koo im ready wenever."

Albarran: "That's right g."  (Some punctuation added.)

### 2.    *Garcia-Santos text messages*

Regarding evidence of text messages exchanged between Garcia-Santos and Viri, the first one he challenges concerned a car wash held to raise money for Toscano after he had been arrested for Gerardo's murder.  In his text, Garcia-Santos wrote:  "No [the car wash is] for the homie th[]at got locked up lil E he was with us when we did that."

The second text exchange Gonzales challenges took place several days after Toscano's arrest.  Viri asked Garcia-Santos why it took him so long to text her back, to which he responded:  "Cause we[']re all talking about our [alibis]."

31.

### B. *Analysis*

Regarding the first set of text messages between Albarran and Sicko, Gonzales contends the trial court erred in finding them admissible against him as statements of coconspirators because there was insufficient evidence that he (Gonzales) participated in a conspiracy to commit murder. We need not reach the merits of this contention because assuming, *arguendo*, the trial court erred admitting the evidence of the text messages, Gonzales cannot establish prejudice under the applicable *Watson*[8] standard or the *Chapman*[9] standard he claims should apply. The text exchange was cumulative of other properly admitted evidence showing that Toscano held Westsiders responsible for the shooting that injured his brother Jacob and that appellants planned and committed the offenses in retaliation for the shooting.

With respect to the second set of text messages at issue, between Garcia-Santos and Viri, Gonzales argues the trial court erred in admitting them under the hearsay exception for statements against penal interest because they were ambiguous and therefore untrustworthy. A reviewing court may overturn the trial court's determination only if that discretion was abused. (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) The court here did not abuse its discretion in finding that Garcia-Santos's statements to his girlfriend were sufficiently trustworthy for purposes of admitting them as statements against penal interest.

Garcia-Santos's use of the personal pronouns "us," "we," and "our" in his text messages, without specifically identifying the persons to whom he was referring, did not render his statements too ambiguous to be trustworthy for purposes of the hearsay exception at issue under any authority Gonzales cites or of which we are aware. Presumably, Garcia-Santos and Viri knew to whom Garcia-Santos was referring and his statements would not have been ambiguous to them. Moreover, they were specific

---

[8]     *People v. Watson* (1956) 46 Cal.2d 818, 836.
[9]     *Chapman v. California* (1967) 386 U.S. 18, 24.

enough to indicate Garcia-Santos was involved in the underlying shooting incident for which Toscano had been, in Garcia-Santos's words, "locked up." Whether Garcia-Santo's self-implicating statements were, in fact, referring to the shooting incident or the other appellants was a question for the jury to decide; however, there was certainly enough circumstantial evidence for the jury to answer that question in the affirmative. It was not an abuse of discretion, therefore, for the trial court to conclude that Garcia-Santos's text messages were not too ambiguous but sufficiently trustworthy for purposes of admitting them as declarations against penal interest.

## VIII.   *Failure to Instruct on the "Escape Rule"*

Aguero asserts the trial court erred by failing to instruct the jury, sua sponte, with CALCRIM No. 3261. The other appellants all join in Aguero's assertion. CALCRIM No. 3261 is a pattern instruction designed to assist jurors in determining whether a perpetrator reached a place of temporary safety for purposes of the so-called "escape rule." Under this rule, a killing committed by a felon during his or her flight from the scene of the crime, and before reaching a place of temporary safety, is within the scope of the felony-murder statute (§ 189). (*People v. Wilkins* (2013) 56 Cal.4th 333, 341 (*Wilkins*).)

The escape rule is closely connected to the continuous transaction doctrine, i.e., the concept that felony-murder liability may be found in the absence of a strict causal or temporal relationship between the underlying felony and the act resulting in death so long as it is proven beyond a reasonable doubt that the crime and the killing were part of one continuous transaction. (*Wilkins*, *supra*, 56 Cal.4th at pp. 340, 342.) Such a transaction may include the defendant's flight after the felony is committed. (*Id.* at p. 340.) "When the killing occurs during flight,… the escape rule establishes the 'outer limits of the "continuous-transaction" theory.'" (*Id.* at p. 345, quoting *People v. Portillo* (2003) 107 Cal.App.4th 834, 846.)

None of the appellants asked the trial court to provide the jury with instructions on the escape rule.  However, the jury was instructed with former CALCRIM No. 549, which defined "one continuous transaction."  Had the jury also received instructions pursuant to CALRIM No. 3261, which Aguero argues was mandatory under the facts of the case, it would have been told that a perpetrator is considered to have reached a place of safety if he or she (1) has successfully escaped from the scene; (2) is no longer being chased; (3) has unchallenged possession of the stolen property; and (4) is no longer in continuous physical control of the person who is the target of the robbery.  (CALCRIM No. 3261 (2006 rev.).)

"Whether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominately legal.'"  (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568, quoting *People v. Waidla* (2000) 22 Cal.4th 690, 733.)  Aguero's claim is therefore subject to de novo review.  (*People v. Hernandez*, *supra*, at p. 568.)  For the reasons hereafter stated, we reject his assertions of error and conclude that there is no basis for reversal due to the absence of an instruction on the escape rule.

Aguero's position on appeal is based on *Wilkins*, *supra*, 56 Cal.4th 333, where the California Supreme Court found reversible error in a trial court's refusal to grant a defendant's request to have jurors instructed on the escape rule.  The trial court had utilized CALCRIM No. 549 to instruct on the continuous transaction doctrine, but ruled that an additional instruction under CALCRIM No. 3261 was not appropriate.

The factual circumstances were markedly different from those in this case.  The *Wilkins* defendant was prosecuted for felony murder after a stove fell off the back of his pickup truck while he was driving on a four-lane highway, causing a fatal traffic accident.  (*Wilkins*, *supra*, 56 Cal.4th at pp. 338–339.)  He had stolen the appliance while burglarizing a partially constructed home, and the evidence presented an issue regarding whether or not he had reached a place of temporary safety when the killing occurred.

34.

"Even under the prosecution's theory of events, defendant was 62 miles away from the scene of the burglary when the stove fell off his truck and he had been driving on the freeway at normal speeds for about an hour. There was no evidence that anyone was following him or that anyone was even aware of the burglary." (*Id.* at pp. 347–348.)

Here, the trial court was not obligated to instruct on the escape rule because there was no substantial evidence that appellants had "successfully escaped from the scene" (CALCRIM No. 3261) of the robbery before Toscano shot and fatally wounded Gerardo. Even assuming the evidence showed that appellants' and Gerardo's groups were preparing or beginning to go their separate ways shortly before the shooting and, consequently, appellants were not being chased and had unchallenged possession of Gerardo's property, the escape rule still did not apply because it is undisputed that appellants remained in close proximity to the scene of the robbery (i.e., next to the car into which Gonzales reached and grabbed Gerardo's property) until after Toscano shot Gerardo, at which point they began running from the scene of both the robbery and shooting. Aguero's unique theory that the area around a crime scene might nonetheless qualify as a place of temporary safety for purposes of the escape rule, so long as the other elements of the rule have been met, is unpersuasive and unsupported by authority.

## IX.    *CALCRIM No. 400 and "Equally Guilty" Language*

Prior to 2010, CALCRIM No. 400, defining the general principles of aiding and abetting, advised that a person is "equally guilty" of a crime whether he or she committed the crime personally or aided and abetted the perpetrator. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 (*Samaniego*), citing former CALCRIM No. 400 (2009 rev.).) The "equally guilty" language has since been removed from the instruction. (See CALCRIM No. 400 ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator"].) Although the proceedings below were conducted in 2012, the jury was instructed pursuant to an outdated version of CALCRIM No. 400. Aguero, Garcia-Santos, and Gonzales allege instructional error based on the

"equally guilty" language that was used in the trial court's explanation of the law concerning accomplice liability.**10**

None of the appellants objected to, nor requested modification or clarification of, the challenged instruction. This failure to act should be fatal to their claim since there are several published opinions which hold that a challenge to the "equally guilty" language in former versions of CALCRIM No. 400 is forfeited by a failure to object and/or request clarifying language at the time of trial. (E.g., *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 [addressing challenge to the "equally guilty" language in CALJIC No. 3.00]; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118–1119 (*Lopez*) [disapproved on other grounds in *People v. Banks* (2015) 61 Cal.4th 788, 809]; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1163.). Forfeiture aside, we find the alleged error to be harmless under any standard of prejudice.

The challenged version of CALCRIM No. 400 did not contain an incorrect statement of law. "All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433; accord, § 31 ["All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, ... are principals in any crime so committed"].) Nevertheless, a number of appellate decisions hold that under extraordinary circumstances, the aider and abettor may have a mental state which reflects a lesser level of culpability than that of the direct perpetrator. (See, e.g., *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1164–1165 ["while generally correct in all but the most exceptional circumstances, [CALCRIM No. 400] is misleading here and should have been modified"].)

---

**10** The relevant text of the instruction read: "A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator."

36.

According to the California Supreme Court, it is possible for an aider and abettor to be convicted of a crime *greater* than the offense for which the actual perpetrator is liable. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118–1119, 1122.) In light of this holding, appellate courts have reasoned that the opposite must be true, i.e., an aider and abettor can theoretically be convicted of a lesser crime than the offense for which the actual perpetrator is liable. (*Lopez*, *supra*, 198 Cal.App.4th at p. 1118; *Nero*, *supra*, 181 Cal.App.4th at pp. 513–518; *Samaniego*, *supra*, 172 Cal.App.4th at pp. 1163–1164.) Given these possible outcomes, the "equally guilty" language is potentially misleading insofar as it suggests that the direct perpetrator and the aider and abettor must be found guilty, if at all, of the same crime(s) and degree(s) thereof. However, reversible error stemming from the use of this language has only been found in cases where jurors informed the trial court that they were confused by the instruction, and the court failed to provide adequate clarification in response to their inquiries on the subject. (*People v. Loza* (2012) 207 Cal.App.4th 332, 352-355 (*Loza*); *Nero*, *supra*, 181 Cal.App.4th at pp. 517–520.)

We do not presume a jury has been misled by an erroneous instruction. To the contrary, "[a] defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant." (*People v. Cross* (2008) 45 Cal.4th 58, 67–68.) Otherwise, we adhere to the presumption that jurors are "able to understand and correlate instructions," and follow the instructions that they are given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) This presumption was rebutted in *Loza* and *Nero*, *supra*, through evidence which clearly showed that the jurors were confused as to what mental state was required to establish aider and abettor liability. (*Loza*, *supra*, 207 Cal.App.4th at p. 355 ["the questions this jury asked indicated that despite having been provided instructions from which they should have understood that they were required to consider the intent of the person accused of aiding and abetting the

37.

perpetrator, the jury remained confused as to this issue"]; *Nero*, *supra*, 181 Cal.App.4th at p. 518 ["where, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be. The trial court, however, by twice rereading CALJIC No. 3.00 [containing the 'equally guilty' language] in response to the jury's question, misinstructed the jury"].) Here, in contrast, the record is devoid of any indication that the jury was confused by the aiding and abetting instructions.

"In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.) A jury instruction is not judged in artificial isolation, but rather from the entire charge of the court and the overall trial record. (*People v. Solomon* (2010) 49 Cal.4th 792, 822; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331.) In this case, the instruction given under CALCRIM No. 400 was immediately followed by a more detailed explanation of the required mens rea for aiding and abetting liability as set forth in CALCRIM No. 401.[11]

Considering that the jury was properly instructed under CALCRIM No. 401 and expressed no confusion regarding the "equally guilty" language in CALCRIM No. 400,

---

[11]     CALCRIM No. 401 instructed the jury: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to have actually been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor. [¶] A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed…."

38.

we are not persuaded that a miscarriage of justice occurred through the use of the latter instruction. (See *Lopez*, *supra*, 198 Cal.App.4th at pp. 1119–1120 [any error in CALCRIM No. 400's "equally guilty" language was harmless where jury was also instructed with CALCRIM No. 401].) The entirety of the instructions properly informed the jury as to the intent required for aider and abettor culpability. We thus conclude that the inclusion of the phrase "equally guilty" in CALCRIM No. 400 did not constitute reversible error.[12]

## X.    *Natural and Probable Consequences Doctrine and Chiu*

On June 2, 2014, after the original briefing was completed in this appeal, the California Supreme Court decided *Chiu, supra*, 59 Cal.4th 155. *Chiu* held that a conviction of premeditated murder cannot be based on the theory that the defendant aided and abetted another offense of which premeditated murder was a natural and probable consequence. Since this was one of the theories of first degree murder on which the jury was instructed in this case, Garcia-Santos filed a supplemental opening brief arguing that the instructional error was reversible. Both Gonzales and Toscano have joined in Garcia-Santo's argument.

Chiu was accused of urging a confederate to shoot a victim during a fistfight. He admitted he was involved in the fight but denied he knew about the gun or encouraged the shooter to shoot. The victim was shot and killed. (*Chiu, supra*, 59 Cal.4th at p. 160.)

Chiu's jury was instructed that if it found Chiu guilty of aiding and abetting the shooter only in the crimes of assault or disturbing the peace, it could still find him guilty of murder if a reasonable person would know that murder was a natural and probable consequence of the commission of the assault or the disturbance of the peace. The jury

---

[12]    In light of our conclusion, we reject Garcia-Santos's related claim that the prosecutor committed misconduct in closing argument by invoking the "equally guilty" language in CALCRIM No. 400. Garcia-Santos also forfeited this claim by failing to raise it below.

was further instructed that the murder was of the first degree if the shooter acted willfully, deliberately and with premeditation. (*Chiu, supra,* 59 Cal.4th at pp. 160–161.)

The court instructed the jury on another theory of murder as well: it could find Chiu guilty of murder if it found he directly aided and abetted the shooter in committing murder. Again, the degree of murder would be determined by finding whether the shooter acted willfully, deliberately and with premeditation. (*Chiu, supra*, 59 Cal.4th at pp. 160–161.) The jury returned a verdict against Chiu of first degree murder. (*Id.* at p. 161.)

The Supreme Court held that it was error to allow the jury to find first degree murder on the theory that Chiu aided and abetted a less serious offense of which murder was a natural and probable consequence. In the court's view, it is not appropriate to impose the increased penalties for *first degree* murder on a defendant who only aided and abetted a lesser offense: "Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the … public policy concern of deterrence." (*Chiu, supra*, 59 Cal.4th at p. 166.) Consequently, a defendant who aids and abets a lesser crime that would naturally and probably result in murder is guilty only of second degree murder, even if the perpetrator killed with premeditation, provided that the defendant is not guilty of first degree murder under the felony-murder rule set forth in section 189. (*Chiu*, *supra*, at p. 166.)

The Supreme Court emphasized that its holding did not preclude aider and abettor liability for premeditated murder where the defendant aids and abets murder directly. The mental state component for aiding and abetting consists of knowledge of the perpetrator's unlawful purpose plus intent to aid or encourage commission of the crime.

Because this mental state "extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder." (*Chiu, supra*, 59 Cal.4th at p. 167.) Consequently, "[a]n aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent." (*Ibid.*)

The Supreme Court then turned to the question of whether the error was harmless or not. The jury was given both the erroneous instructions allowing it to find premeditated murder based on the natural and probable consequences doctrine, and correct instructions allowing it to find Chiu guilty of aiding and abetting premeditated murder directly. The error would be harmless if the record showed beyond a reasonable doubt that the jury must have relied on the latter, legally valid, theory. (*Chiu, supra,* 59 Cal.4th at p. 167.) The record of discussions between the court and jurors during deliberations showed that the jury apparently was deadlocked at one point on whether to find first degree or second degree murder, and this could have been because of one juror's reluctance to find premeditated murder based on the natural and probable consequences doctrine. Further, the verdict of first degree murder was reached only after that juror was relieved and replaced by an alternate. It followed that the jury could have relied on the erroneous natural and probable consequences instruction, so the error was not harmless beyond a reasonable doubt. (*Id.* at pp. 167–168.)

The court upheld the Court of Appeal's reversal of Chiu's first degree murder conviction. On remand, the prosecution was to be given a choice between accepting a reduction of the conviction to second degree murder and retrying the first degree murder charge under a theory of direct aiding and abetting. (*Chiu, supra*, 59 Cal.4th at p. 168.)

The instructions stating that appellants could be found guilty of murder (and that this murder could be found to be of the first degree) if they aided and abetted another offense of which murder was a natural and probable consequence have the same defect as

41.

the instructions held invalid in *Chiu*: They allowed a first degree murder conviction under the natural and probable consequences doctrine based on aiding and abetting another offense. Under *Chiu*, we must reverse unless the error was harmless beyond a reasonable doubt.

The People point out that, in making the special-circumstance finding under section 190.2, subdivision (a)(22), the jury necessarily determined that appellants intended to kill.[13] We agree with the People's argument that this finding shows the *Chiu* error was harmless beyond a reasonable doubt, for it is compatible only with the theory that they aided and abetted murder directly. The point of giving the jury the natural and probable consequences instructions was to enable it to find appellants guilty of murder even if it believed their intent was only to help Toscano commit the crimes of unlawful assembly, challenging a person to fight, and/or grand theft from the person. Since the jury believed appellants intended to kill, there was no reason for it to resort to that indirect route in finding them guilty of murder. In sum, the findings make it clear that the jury found Aguero, Garcia-Santos, and Gonzales intentionally helped Toscano commit murder. Therefore there is no likelihood the natural and probable consequences instructions caused the jury to reach murder verdicts it otherwise would not have reached.

## XI. *Prosecutorial Misconduct Claim*

Garcia-Santos contends that by comparing premeditation to "the everyday decision of whether to stop at a stop signal" the prosecutor committed misconduct and violated his due process rights because the prosecutor's analogy misstated and trivialized the concept of premeditation and effectively lowered the prosecution's burden of proof. Gonzales and Toscano both join in Garcia-Santos's prosecutorial misconduct claim.

---

**13**    Section 190.2, subdivision (a)(22), provides for a punishment of death or life imprisonment without possibility of parole for a first degree murderer who "*intentionally killed the victim* while … an active participant in a criminal street gang … and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

42.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"'" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless, in a timely fashion and on the same ground, the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Sapp* (2003) 31 Cal.4th 240, 279; *People v. Montiel* (1993) 5 Cal.4th 877, 914 [although trial counsel objected to prosecutor's remarks at trial, the failure to request admonition constituted a forfeiture of claim of prosecutorial misconduct on appeal].)

Here, defense counsel never objected on the grounds of prosecutorial misconduct and did not request that the jury be admonished, thereby forfeiting the claim on appeal. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) But even on the merits, we find Garcia-Santos's claim lacking, and for that reason do not need to discuss his further claim of ineffective assistance of counsel for failing to object.

Garcia-Santos claims prosecutorial misconduct occurred when the prosecutor made the following comments during closing argument:

> "We premeditate and deliberate every day. We make quick decisions with thinking about the consequences. One of the examples that we do on an everyday basis is when we drive a car. When we're driving a car and we approach a traffic signal and the light turns from green to amber we have to make a decision. We weigh the consequences for and against. Are we gonna go through the light? Go through the light and you may get a ticket. You may get a picture—one of those photographs the City of Bakersfield

sets up. We may get in an accident. Or we could stop. You stop and the consequence is at least with me my purse always falls on the floor. You know, those kinds of consequences. You weigh that kind of stuff. You weigh it. You consider it and you choose a course of action. In that circumstance, that is sufficient deliberation. You weigh the consequences before one or the other and choose a course of action."

The prosecutor's comments are not objectionable, particularly when viewed in context with the comments directly preceding them, which are omitted from Garcia-Santos's discussion of the issue. Specifically, the prosecutor explained that the charge of first degree murder was being advanced on three different theories, the first of which was "willful, premeditated, deliberate murder." Invoking the language of CALRIM No. 521,[14] she went on to describe the "legal definitions" of the terms, in relevant part, as follows:

> "Deliberate means carefully weighed the consequences for and against and chose a choice of action which was deciding to kill. And premeditated considering beforehand. Length of time alone doesn't determine premeditation or deliberation. The amount of time will vary from person to person. Cold calculated decision can be reached quickly. The test is the reflection, not the length of time."

Immediately after these comments, the prosecutor made the traffic light analogy Garcia-Santos now challenges on appeal. He complains that the premeditation required for first degree murder "entails a much weightier decision-making process than that required for … interpreting traffic signals" and "requires that a killing occur as a result of careful thought and weighing of considerations based on pre-existing reflection rather than on an uncontested or rash impulse." Nothing in the prosecutor's argument, however, suggested that the deliberation and premeditation required for murder could be shown by

---

**14** The jury was instructed under CALCRIM No. 521: "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate or premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

44.

anything less than what was provided in the correct legal definitions she had just described and upon which the jury was duly instructed.

Instead, when the prosecutor's comments are viewed in context with her argument as a whole, it seems clear that they served not to trivialize or dilute the concept of premeditation but simply to illustrate, in laypersons' terms, the somewhat counterintuitive notion that a quickly-reached decision may still qualify as a deliberate and premeditated one, so long as sufficient reflection and consideration are present. The prosecutor demonstrated this by using the traffic light analogy to show how it is possible for a person to engage in a reflective and considered decision-making process, weighing the potential consequences of various options, to reach a decision in an extremely short period of time.

In short, the prosecutor did not misstate the law regarding the deliberation and premeditation required for first-degree murder nor did her challenged comments imply that a premeditated and deliberate decision to kill could be the result of an unconsidered or rash impulse. Garcia-Santos's contrary interpretation is unsupported by the record and therefore we reject his claim of prosecutorial misconduct.

## XII. *Gang Special Circumstance Applies to Aiders and Abettors*

Garcia-Santos contends that because he was not the shooter, the gang special circumstance (§ 190.2, subd. (a)(22)) was unauthorized in this case since the statutory language indicates it only applies to perpetrators, not to aiders and abettors. Gonzales joins in Garcia-Santos's argument. Garcia-Santos recognizes that this court rejected his argument in *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1086 but asks us to reconsider our decision. We decline to do so.

## XIII. *Section 12022.53, Subdivision (e)(1) and Equal Protection*

No evidence was presented at trial that any of the appellants other than Toscano shot Gerardo. Nevertheless, the sentence of each was enhanced by a term of 25 years to

life in prison pursuant to section 12022.53, subdivisions (d) and (e)(1).[15]  Gonzales now contends subdivision (e)(1) of section 12022.53 violates his right to equal protection of the laws by treating aiders and abettors of shootings committed for the benefit of a criminal street gang differently from aiders and abettors of shootings committed in concert by criminal organizations or groups not defined as street gangs.  Garcia-Santos joins in this argument.  As we shall explain, the courts in *People v. Gonzales* (2001) 87 Cal.App.4th 1 (*Gonzales*) and *People v. Hernandez* (2005) 134 Cal.App.4th 474 (*Hernandez*) have already rejected Gonzales's argument, and we find no basis to depart from this established authority.[16]

"The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.  [Citations.]  The concept recognizes that persons similarly situated with respect to the legitimate purpose of the law receive like treatment, but it does not, however, require absolute equality.  [Citations.]  Accordingly, a state may provide for differences as long as the result does not amount to invidious discrimination."  (*People v. Romo* (1975) 14 Cal.3d 189, 196.)

---

**15**　　Section 12022.53 provides, in pertinent part:  "(d) Notwithstanding any other provision of law, any person who, in the commission of a [specified felony including murder], personally and intentionally discharges a firearm and proximately causes ... death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.  [¶] (e) [¶] (1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:  [¶] (A) The person violated subdivision (b) of Section 186.22.  [¶] (B) Any principal in the offense committed any act specified in subdivision ... (d)."

**16**　　This type of challenge to the constitutionality of a statute may be raised for the first time on appeal.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 200; see also *People v. Lord* (1994) 30 Cal.App.4th 1718, 1722, fn. 2.)  Accordingly, we reject the People's argument the claim was forfeited by appellants' failure to object in the trial court.

"'""The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner."'"" (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1427.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.) The court in *Gonzalez, supra*, 87 Cal.App.4th at page 13 rejected the argument that an aider and abettor of a gang member who discharges a firearm is similarly situated to an aider and abettor of a firearm user who is not a member of a criminal street gang. The court explained that "[u]nlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct.... [¶] Defendants were not similarly situated with other aiders and abettors, and on that basis, their equal protection argument fails." (*Ibid.*)

But even if Gonzales could show that he was similarly situated with aiders and abettors of nongang members, "'a second level of analysis is required. If the law in question impinges on the exercise of a fundamental right, it is subject to strict scrutiny and will be upheld only if it is necessary to further a compelling state interest. All other legislation satisfies the requirements of equal protection if it bears a rational relationship to a legitimate state purpose.'" (*Gonzalez, supra*, 87 Cal.App.4th at pp. 12–13.) Though Gonzales contends aiding and abetting a gang shooting involves the exercise of a fundamental right subject to strict scrutiny, the court in *Hernandez, supra*, 134 Cal.App.4th at page 483 determined that rational basis review was the appropriate test to resolve an equal protection challenge to section 12022.53, subdivision (e)(1). The rational basis test typically applies to an equal protection challenge to a criminal statutory scheme where there is no claim that the classification at issue involves a suspect class or harsher treatment for a juvenile than an adult. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838 (*Wilkinson*).)

The court in *Hernandez*, *supra*, 134 Cal.App.4th at page 483, further concluded that the enhancement provided by section 12022.53, subdivision (e)(1) satisfied the rational basis test: "Clearly the Legislature had a rational basis for imposing a 25-years-to-life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun, regardless of the relationship between the aider and abettor and the perpetrator. As we previously observed, the purpose of this enhancement is to reduce through punishment and deterrence 'the serious threats posed to the citizens of California by gang members using firearms.' One way to accomplish this purpose is to punish equally with the perpetrator a person who, acting with knowledge of the perpetrator's criminal purpose, promotes, encourages or assists the perpetrator to commit the murder." (*Hernandez*, at p. 483, fn. omitted.)

Citing *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), Gonzales argues that we should not adopt the rational basis test endorsed by *Hernandez*, *supra*, 134 Cal.App.4th 474. Gonzales's argument is contrary to law. In *Wilkinson*, *supra*, 33 Cal.4th 821, the California Supreme Court held that the statutory scheme governing the offense of battery on a custodial officer did not violate equal protection principles. (*Id.* at pp. 838–841.) In reaching its conclusion, the court rejected the defendant's argument that strict scrutiny was required according to *Olivas*, a case involving an equal protection challenge to a statute which gave the trial court discretion to commit a defendant, convicted as an adult and between the ages of 16 and 21, to the California Youth Authority for a longer term than the defendant would have received if he or she had been sentenced as an adult. (See *Wilkinson*, at p. 837.) The *Wilkinson* court concluded that *Olivas* did not stand for the proposition that strict scrutiny is required for an equal protection challenge on the grounds a penal statute authorizes different sentences for comparable offense. The court explained that *Olivas* "'requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of

a compelling state interest therefor.' [Citation.] Other courts similarly have concluded that a broad reading of *Olivas*, as advocated by defendant here, would 'intrude[] too heavily on the police power and the Legislature's prerogative to set criminal justice policy.'" (*Wilkinson*, at pp. 837–838.) Accordingly, the rational basis test applied in *Hernandez* is applicable and results in the conclusion that section 12022.53, subdivision (e)(1) does not violate equal protection principles.

## XIV. *Redundant Prior Prison Term Finding against Toscano*

At a bifurcated trial, the trial court found true allegations that Toscano had served *three* prior prison terms within the meaning of section 667.5, subdivision (b); i.e., one prison term for each of three, felony drug-related convictions he sustained in 2006, 2007, and 2009. However, it is undisputed that Toscano served only *two* prison terms within the meaning of the statute because concurrent sentences were imposed for his 2007 and 2009 convictions. (See *People v. Jones* (1998) 63 Cal.App.4th 744, 747 ["Courts have consistently recognized … that only one [§ 667.5, subd. (b)] enhancement is proper where concurrent sentences have been imposed in two or more prior felony cases"].)

The People and Toscano essentially agree that in this situation a trial court should "strike the redundant [third] prior prison term finding." (*People v. Riel* (2000) 22 Cal.4th 1153, 1226.) However, Toscano contends the trial court should be further directed to issue an order explicitly finding the third prior prison term allegation to be not true. We agree with the People that such order is unnecessary because the record demonstrates the trial court has already stricken the redundant prior prison term finding.

The trial court effectively struck the third prior prison term finding at sentencing, when it imposed only two enhancements pursuant to section 667.5, subdivision (b), and specified in the minute order that these enhancements were based on the first two prior prison term allegations stemming from Toscano's 2006 and 2007 convictions.[17]

---

[17] During the sentencing hearing, the trial court specifically acknowledged only two prior prison term enhancements could be imposed against Toscano: "Now, as to the three—the three

49.

Moreover, the abstract of judgment correctly reflects only two section 667.5, subdivision (b) enhancements were imposed and expressly states no stricken enhancements are to be listed. The record thus affirmatively demonstrates the absence of a need for any further corrective action on the part of the trial court.

## XV. *Parole Revocation Fine*

Garcia-Santos and Gonzales contends the trial court erred, and imposed an unauthorized fine, by imposing a parole revocation fine in a case where there is no parole eligibility. The People properly concede the error as to all four appellants. Section 1202.45 provides for a fine equal to the restitution fine under section 1202.4 "[i]n every case where a person is convicted of a crime and [whose] sentence includes a period of parole." (§ 1202.45, subd. (a).) The parole revocation fine may not be imposed where a defendant is sentenced to life in prison without parole. (*People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v. Ybarra, supra,* 166 Cal.App.4th at p. 1097; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.) Because appellants received sentences of life without parole for their murder convictions, the parole revocation fine imposed as to each was unauthorized and must be stricken.

## XVI. *Victim Restitution Order*

The trial court ordered appellants each to pay $21,249.21 to Gerardo's mother for funeral and burial expenses and lost wages pursuant to section 1202.4, subdivision (f). Aguero and Gonzales contend the order should be modified to make the obligation to pay victim restitution joint and several. Garcia-Santos and Toscano join in this contention.

Trial courts have authority to make the restitution obligations of multiple codefendants joint and several. (§ 1202.4, subd. (f); *People v. Blackburn* (1999) 72

---

one-year prison priors that were alleged, … as [Toscano's counsel] points out those were served as concurrent terms and on June 25th, '07 the [Health and Safety Code section] 11350 and then on July 13th, 2009, there was a concurrent and so only two allegations pursuant to Penal Code Section 667.5[, subdivision] (b) may be imposed and that would be with the second one on July of '06, the [Health and Safety Code section] 11377."

Cal.App.4th 1520, 1535 (*Blackburn*).)  The imposition of joint and several liability is not mandatory, but is consistent with each defendant's obligation to reimburse the victims for their losses, may increase the likelihood that each victim will be fully compensated, and safeguards against double recovery.  (See *People v. Madrana* (1997) 55 Cal.App.4th 1044, 1049–1051.)

All four appellants were convicted of premeditated first degree murder and it is apparent from the record the trial court intended to hold them jointly liable for victim restitution.[18]  Therefore, it is appropriate to amend the abstract of judgment to reflect that the victim restitution is imposed jointly and severally upon all codefendants ordered to pay victim restitution with respect to count 1.  (See *Blackburn*, *supra*, 72 Cal.App.4th at p. 1535 [where it seemed "glaringly obvious" from the record that the trial court intended restitution liability to be joint and several, the modification of judgment is actually nothing more than a clarification made in "an excess of caution"].)[19]

---

[18]  The trial court's apparent understanding that victim restitution was a joint and several obligation of all the codefendants is reflected in statements it made at the May 17, 2012 hearing, when codefendant Albarran entered a plea of no contest to second degree robbery (count 2). During the hearing, the court explained to Albarran, who was then 17 years old, that even though he was pleading guilty only to the robbery, he might still be ordered to pay victim restitution based on the murder.  The court thus stated:  "The *Harvey* waiver, you have that down as apparently for Count 1, the murder.  In other words, you have to make—the Court will consider the loss to that family as a result of what you're entering a plea to.  [¶] … [¶]  And that specifically says although some charges will be dismissed as a result of my plea of guilty or no contest, I agree that *the sentencing judge may nevertheless consider the facts underlying the dismissed counts or cases, including determining any additional restitution I may have to pay*, in deciding the sentence in my case.  [¶]  *So if there were, for example, funeral expenses, that would be—you would have to be responsible for that, along with any other defendant that might be held liable for that loss*.  [¶]  Do you understand that?  *That would be a joint and several order*."  (Italics added.)

[19]  Under the unique circumstances of this case, we are not persuaded by the People's assertion that appellants forfeited the issue by failing to raise it at the time of the sentencing hearing.

## *DISPOSITION*

The trial court shall amend the abstract of judgment for each appellant to reflect the parole revocation fine imposed under Penal Code section 1202.45 has been stricken, and the order to pay victim restitution under Penal Code section 1202.4 is jointly and severally imposed upon all codefendants, and provide copies of the amended abstracts of judgment to the appropriate authorities. In all other respects, the judgment of conviction as to each appellant is affirmed.

_____
HILL, P.J.

WE CONCUR:

_____
KANE, J.

_____
SMITH, J.